UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO.

| | |
|---|---|
| Deanne M. Hall Haggins,<br>    Plaintiff,<br><br>v.<br><br>Wilson Air Center, LLC;<br>    Defendant. | COMPLAINT<br><br>Americans with Disabilities Act<br>42 U.S.C. 12101 et seq.<br><br>Jury Demanded |

**Plaintiff complaining of acts** of the defendant alleges and states:

1. Plaintiff brings this action pursuant to the Americans with Disabilities Act of 1990 (ADA), as amended by the ADA Amendments Act of 2008 (ADAAA) (42 U.S.C. §§ 12101-12213).

## JURISDICTION AND VENUE

2. The jurisdiction of this court is established by 28 U.S.C. 1331.

3. Venue is in this court because the defendant's principle place of business is located in Mecklenburg County, North Carolina, and the actions complained of herein occurred in this district.

## THE PARTIES

4. Plaintiff Deanne M. Hall Haggins is a citizen and a resident of Cabarrus County, North Carolina. Plaintiff was employed by the defendant at the Wilson Air Center facility located at 5400 Airport Dr. Charlotte, NC 28208.

1

5. The defendant Wilson Air Center, LLC (hereinafter Wilson Air Center) is a corporation organized and existing under the laws of the State of Tennessee with a principal place of business located in Charlotte, North Carolina and it is engaged in commerce in the business of corporate aviation support services. Wilson Air Center operates as the management company for Charlotte Douglas International Airport on the Fixed Based Operation (FBO) side.

6. The defendant employer regularly employed fifteen or more full-time employees at the Charlotte location where plaintiff was employed, at all times relevant to this action.

## CONDITIONS PRECEDENT

7. Plaintiff has fulfilled all conditions precedent to the initiation of this action. Plaintiff timely filed charges with the United States Equal Employment Opportunity Commission (EEOC) (Exh. A), and received a Right to Sue Letter on March 2 2022. (Exh. B). Plaintiff is filing this action with 90 days of receipt of the Right to Sue Letter.

## FACTS

8. The plaintiff began employment with the defendant Wilson Air Center on February 1 2005.

9. The plaintiff was terminated from her employment with Wilson Air Center on June 17 2021.

10. The plaintiff was employed by the defendant as an accounts payable supervisor.

11. In March 2020 plaintiff Haggins was diagnosed with breast cancer. She notified the employer of the cancer diagnosis shortly after she was first notified.

12. Due to the onslaught of COVID in March 2020, all administrative staff at the Charlotte location worked a hybrid schedule starting in March 2020. This was designed as a safety precaution to limit the amount of people in the office at once.

13. When the administrative staff started working from home, the Plaintiff was provided with a company laptop that allowed her to complete work-related assignments from home. Plaintiff accessed her work email and clocked in and out through MS Teams.

14. From March 2020 until June 2020, the plaintiff worked in the office Monday, Tuesday and Wednesday every week and worked from home the other days. Beginning in June 2020 plaintiff started working from home full time due to medical restrictions.

15. While working from home during that period of time, plaintiff was only getting compensated for 30 hours per week, while the other administrative staff were being paid for 40 hours. At management's insistence, the plaintiff did not work on Fridays.

16. Plaintiff underwent a double mastectomy surgery on September 23 2020.

17. After the double mastectomy surgery, the plaintiff used her paid vacation time until October 25 2020. Then, beginning on October 26 2020, the plaintiff was placed on Family and Medical Leave Act leave. During plaintiff's surgery the doctors

found some cancer residue in her lymph nodes. Plaintiff underwent six weeks of radiation treatment. The radiation treatments ended on January 5 2021.

18. The radiation treatments put a delay in the original plans for plaintiff's reconstruction surgery after the double mastectomy. In addition, plaintiff's medical condition required that she undergo an additional year of infusion treatments, which were to occur once every three weeks.

19. Plaintiff's oncologist gave her a medical note that released her to return to work, but only working from home. Plaintiff notified the defendant Wilson Air Center of the delay in the reconstruction surgery and that she would need to have infusion treatments once every three weeks.

20. Plaintiff continued working from home because of her compromised immune system from cancer, her medical limitations, and her ongoing treatments, as well as the increase in COVID/Delta variant until May 2021.

21. On May 10, 2021 plaintiff received a company email from Denise Bonds dated May 9, 2021 stating that Vince Papke, the general manager, wanted to have a meeting with her. Plaintiff asked if the meeting could be held virtually over MS Teams, so that she wouldn't have to come to the office.

22. Denise stated that Vince insisted that she come into the office that day. She and Vince Papke met in his office on May 10 2021.

23. Plaintiff advised Vince of the complications related to her treatment and recovery. She explained that things were moving forward toward her breast reconstruction surgery.

24. During that meeting, Vince told the plaintiff that he wanted her to come back to work physically in the office. When she asked him what more did he need her to do than she was already doing from home, he said he didn't know and then he asked Jon Cox and Denise Bonds to come into the office and join their meeting.

25. When Jon Cox came into the room, he agreed that plaintiff could work from home handling the duties of her accounts payable position. But Vince Papke insisted that she return to physically work in the office.

26. During that time that plaintiff was allowed to work from home, she performed the essential duties of her position. Plaintiff entered the contract fuel tickets every day. She entered all of the invoices that she received via email and sent them to Jon Cox once she was done. She kept up with the company Shell spreadsheet, which tracked the daily sales and submitted it to Jon Cox at the beginning of the next month. She ordered office supplies. She verified statements and contacted the vendors when she needed invoice copies or clarification. She verified that the catering invoices were paid and entered them into QuickBooks. She entered the budget information into QuickBooks. She would call or text and see if anyone had anything that they needed her to help them with. She did any special request or projects. She would make the electronic payments for the company electric bills, gas bills and other bills that had been set up to pay online or over the phone. Jon Cox confirmed all of this at the meeting on May 10 2021 with Vince Papke.

27. Plaintiff also suggested picking up the invoices or someone scanning the invoices and emailing them to her, as this had been recommended before. Jon Cox

agreed that it would be a good idea and that plaintiff could continue to work from home. Vince Papke however, stated that he wanted the plaintiff to be physically present in the office.

28. Plaintiff spoke to Vince Papke about the reconstruction surgery. She explained that it was delayed because of her low white blood cell counts. She explained that she was very susceptible to disease and if she caught anything it could be extremely detrimental to her health.

29. Despite being informed of the detrimental effects of being forced to physically return to the office to work, Vince Papke insisted that plaintiff return to work physically in the office. Plaintiff agreed to try to return to her physical presence in the office around her various medical appointments. She advised them in that meeting that "I am not quitting." She advised her health came first.

30. After that meeting, plaintiff contacted Emily Cates in the corporate human resources office on May 12 2021 through Microsoft Teams. On May 17 2021 Emily called plaintiff on her phone and plaintiff explained that she was working from home and she had a doctor's note as requested by Denise Bonds to cover her absences. Emily asked was anyone else still working from home and Plaintiff told her she didn't believe so, but no one else had breast cancer, a compromised immune system, or was still receiving treatments. Emily asked plaintiff to send her a copy of her doctor's note and she would talk with Vince Papke and then get back with her. Plaintiff continued to work from home until she heard back from Emily.

31. On May 25 2021 Emily Cates called plaintiff and told plaintiff that she was required to physically report for work at the office beginning the very next day, May 26 2021. She also stated that plaintiff did not have any further FMLA rights.

32. Emily said that plaintiff would need to be double masked and keep her door shut. She also said that they would be reducing her hours to 30 hours per week. Plaintiff told her that she had two doctor's appointments on May 26 and her regular scheduled infusion on May 27 2021. Plaintiff asked Emily if she could start physically reporting to the office on Monday instead. Emily responded no and stated that plaintiff had to physically report to the office "tomorrow." Plaintiff asked her was she supposed to be able to report to the office May 26 when she had two doctor's appointments one in the morning and one in the afternoon. Emily respondent that plaintiff needed to contact Papke at the local location.

33. Plaintiff sent an email to Vince Papke, Dave Tresaloni, Jon Cox and Denise Bonds. She also sent a MS Teams message to Denise to clarify if they were requiring that she physically report to the office tomorrow (May 26 2021). Plaintiff was advised that Vince was requiring that she physically report to the office between her medical visits on May 26 2021.

34. On May 26 2021, plaintiff physically reported for work that morning for two hours before her medical appointment. Plaintiff then clocked out and went to her first medical appointment. After the first medical appointment, plaintiff returned to the office and worked until it was time to go to her afternoon medical appointment. Plaintiff

7

then clocked out and went to her afternoon medical appointment. This left plaintiff mentally and physically exhausted.

35. On May 27 2021 plaintiff had a medical appointment to receive an infusion. She had previously advised Vince, Jon, and Denise on May 10 2021 that these infusions occurred once every three weeks and that on the day of the infusions she would not be able to come to work at all. When plaintiff clocked in from home that morning, she got a response from Denise through MS Teams at 8:27 a.m. asking what time she was coming in. Plaintiff reminded Denise that she would not be reporting to work physically on the days of her infusions. Later that morning, when plaintiff was at her medical appointment to receive the infusion the nurse noted that her blood pressure levels were extremely high.

36. Plaintiff then texted Vince Papke and told him that they needed to talk, and sent to him a picture of her blood pressure reading. He said he would call her back that afternoon. When he called, she told him that she felt like she was being punished by the company because she had cancer and needed to work from home, and that she didn't ask for this disease.

37. Plaintiff did not work on Fridays because of management's reduction of her hours, and because of the Memorial Day holiday, the next time that she was required to be physically present at work was on June 1 2021. Plaintiff physically reported to work. As she was counting the cash drawer a customer service representative told her that she had something on her shirt. She looked down and saw that the fluid from the cracked expander from the area of the mastectomy, had seeped through the bandages that she had

underneath her shirt. She walked through the dispatch office and into the administration hallway. Dave Tresaloni and Denise Bonds were standing in the hallway. She pointed to her shirt and said, "This is why I need to work from home." Dave Tresaloni went to his office and got some gauze and bandages. Denise Bonds gave plaintiff a Wilson Air Center t-shirt to change into. Plaintiff went to the bathroom to clean up and change. Plaintiff then went into her office and shut the door. Plaintiff continued to work and complete tasks for the next couple of hours. After a couple of hours, more fluid had seeped through the t-shirt. She went to Jon Cox's doorway and asked if he had anything else for her to do and he said no. She told him that she needed to leave for medical reasons. She went across the hall to Denise Bond's office and pointed at her shirt and told her that she was going home.

38. On June 2 2021, plaintiff was scheduled for a medical appointment that day, she logged in from home to perform work related tasks as she had done in the past. Plaintiff logged in, as she had always done, and notified Denise Bonds that she was on the clock working from home. Plaintiff began working on the contract fuel invoices. However, at 6:47 a.m., Denise Bonds responded and informed plaintiff that she could not work from home, and that she either had to be physically present in the office to work or that she had to be off on that day.

39. In response to Denise's statement that plaintiff had to be present in the office to work on the clock, plaintiff responded that someone should have explained that to her. She advised Denise to put her down for a sick day.

40. Plaintiff then asked Denise to send to her a written statement with the new work stipulations so that she could submit it with her cancer hardship paperwork.

41. That same afternoon, Jon Cox sent plaintiff a MS Teams message telling her to turn in her work laptop. Vince Papke, Denise Bonds, and Jon Cox took this action in retaliation for plaintiff requesting the reasonable accommodation of working from home and for plaintiff requesting that the employer provide written documentation of its refusal to allow plaintiff to work from home.

42. Plaintiff went to a doctor's appointment on June 2 2021 and was scheduled for outpatient surgery on June 3 2021.

43. That afternoon of June 2 2021, when plaintiff got on the work laptop to advise Jon and Denise through Microsoft teams that she would not be into work on June 3 2021 because of the outpatient procedure, she saw the message from Jon Cox requiring that plaintiff turn in the work laptop on June 3 2021. Turning in the work laptop meant that plaintiff would not have access to be able to perform any work related activities, including accessing her work email, from home.

44. Plaintiff let Jon know that she would not be into work on June 3 2021 because of the outpatient procedure and confirmed with Jon that since he had requested that she turn in the laptop on June 3 2021 she would no longer use the laptop as of June 3 2021.

45. Plaintiff then sent Denise Bonds a message asking for an update on her new work stipulations. Denise responded and said that Emily Cates in the human resources department was working on them.

46. On June 3 2021 plaintiff's physician removed the expander in an outpatient procedure.

47. On June 4 2021 Vince Papke sent plaintiff a cell phone text. She told him that she felt better than she had felt in two months. She also told him that she had a drain in. She texted Jon Cox on June 6 2021 and told him that she had a drain in and since they didn't want her to work from home, that she would be taking sick days.

48. On June 7 2021 Jon Cox responded by text message and acknowledged receipt of her June 6 2021 text message. On June 8 2021 plaintiff asked the doctor's office when she will be able to physically return to work. She requested that the doctor fax a note regarding her return to work to the defendant. The doctor's office faxed the note over on June 9 2021 that plaintiff could not return from the outpatient surgery before June 17 2021.

49. On June 17 2021 plaintiff attended her regularly scheduled medical appointment to receive an infusion.

50. On the afternoon of June 17 2021, the defendant terminated the plaintiff's employment. The defendant sent to the plaintiff a letter notifying her that she had been terminated. The plaintiff did not receive the letter in the mail until June 21 2021.

51. The defendant terminated the plaintiff because of her disability.

52. The defendant terminated the plaintiff in retaliation for the plaintiff asserting her right under the Americans with Disabilities Act to the reasonable accommodation of being allowed to work from home.

53. At all times relevant therein, the officers, managers and or supervisors who participated in and made the decision to not allow plaintiff to return to work and the decision to terminate plaintiff's employment were acting within the course and scope of their employment with the company. Therefore, the company is liable for the conduct of its agents as the respondent superior.

54. At all times, after being put on notice of the discriminatory and retaliatory conduct of the plaintiff's manager, supervisors and corporate officers, the corporation took no steps to prevent the discriminatory conduct, but instead acquiesced in and ratified the discriminatory conduct.

## FIRST CAUSE OF ACTION
## AMERICANS WITH DISABILITIES ACT

55. Plaintiff incorporates paragraphs 1 through 54 as if fully set out herein.

56. The Americans with Disabilities Act of 1990 (ADA), as amended by the ADA Amendments Act of 2008 (ADAAA) is the primary federal law protecting the rights of individuals with a disability (42 U.S.C. §§ 12101-12213).

57. At all times relevant to this action, the plaintiff was a qualified individual with a disability, was entitled to reasonable accommodation under the American with Disabilities Act, was protected from being terminated because of her disability, and was protected from being terminated in retaliation for asserting her rights under the Americans with Disabilities Act.

58. Plaintiff was terminated because of a disability, cancer, that substantially limits one or more major life functions. Plaintiff has 1) a physical or mental impairment

that substantially limits one or more major life activities (sometimes referred to in the regulations as an "actual disability"), or 2) a record of a physical or mental impairment that substantially limited a major life activity ("record of"); or 3) a disability because the defendant employer took an action prohibited by the ADA because of an actual or perceived impairment.

59. The plaintiff is a qualified person with a disability. Plaintiff is a person with a disability who can satisfactorily perform the duties of the job in question, with or without reasonable accommodation.

60. Defendant discriminated against the plaintiff because of her disability when defendant failed to provide plaintiff the reasonable accommodation of allowing the plaintiff to work from home.

61. Defendant discriminated against the plaintiff because of her disability when defendant terminated the plaintiff because of her disability.

62. Defendant discriminated against the plaintiff because of her disability when it terminated the plaintiff in retaliation for plaintiff asserting her right to a reasonable accommodation of being allowed to work from home.

63. The defendant's conduct was wanton and willful and in knowing and reckless violation of the plaintiff's right to be free from discrimination, based on her disability.

64. The defendant company's termination of the plaintiff violates the provisions of the Americans with Disability Act, in that the defendant discharged, or otherwise discriminated against the plaintiff who is a qualified person with a disability on

the basis of a disabling condition with respect to compensation or the terms, conditions, or privileges of employment and/or in retaliation for asserting his right to be free from disability discrimination.

65. The defendant acted with malice and reckless indifference to the known federally protected rights of the plaintiff, thus entitling the plaintiff to punitive damages.

66. The defendant's alleged reason for termination is mere pretext.

67. Plaintiff was injured by the defendant's illegal conduct, including, but not limited to, the loss of wages and benefits, mental and emotional stress, depression, humiliation, and anguish caused by such illegal treatment, and other consequential damages, including, but not limited to financial hardship, and loss of credit, unemployment benefits, and social security benefits.

### SECOND CLAIM FOR RELIEF
### COMMON LAW WRONGFUL DISCHARGE
### In Violation of North Carolina Public Policy

68. Plaintiff incorporates paragraph 1 through 67 as if fully set out herein.

69. It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of handicap or disability by employers which regularly employ 15 or more employees as stated in N.C.G.S. 143-422.2.

70. N.C.G.S. 168A states that it is the public policy of the State of North Carolina that the practice of discrimination based upon a disabling condition is contrary to the public interest and to the principles of freedom and equality of opportunity; the practice of discrimination on the basis of a disabling condition threatens the rights and

proper privileges of the inhabitants of this State; and such discrimination results in a failure to realize the productive capacity of individuals to their fullest extent.

71. The termination of the plaintiff contravenes and violates the public policy of the state of North Carolina to protect and safeguard the rights of all people to hold employment without discrimination on the bases of handicap and or disability. Plaintiff's termination therefore constitutes common law wrongful discharge in violation of the public policy of the State of North Carolina.

72. The defendant's officers, directors and/or managers acted in complete disregard of the known rights of the plaintiff, and employees like the plaintiff who suffer from a disability or handicap, to be free from discrimination based upon the disability or handicap.

73. The action of the defendant corporation in terminating the plaintiff and violating the public policy as set out above was willful, wanton and malicious and therefore entitles plaintiff to recover punitive damages.

74. The officers, directors, or managers of the defendant corporation participated in or condoned the willful, wanton and malicious conduct giving rise to punitive damages.

75. Plaintiff has been injured as a result of the defendant's conduct. As a direct result of the defendant's actions plaintiff has suffered lost wages, mental anxiety and anguish, damage to credit and financial status, and loss of benefits that she was receiving as an employee of the defendant.

## JURY DEMAND

76. Plaintiff hereby requests and demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Grant Plaintiff's request for a jury trial;

2. Order the Defendant Company to make Plaintiff whole by providing her with the appropriate back pay, with pre- and post-judgment interest and damages for all employment benefits she would have received but for the discriminatory and retaliatory acts and practices of the Defendant Company, together with front pay damages;

3. Order the defendant to make plaintiff whole by providing compensation for past and future non-pecuniary losses resulting from the unlawful employment practices described herein, including but not limited to, mental and emotional anguish, stress, anxiety and depression, suffering inconvenience, loss of enjoyment of life and humiliation, in amounts to be proved at trial.

4. Reinstate plaintiff's employment.

5. Order the defendant to pay compensatory and punitive damages in an amount as determined by a jury;

6. Grant that the costs of this action be taxed against the defendants;

7. Order the defendant to pay plaintiff's reasonable attorney's fees, and

8. Grant such further relief as the Court deems necessary and proper.

This the 3st day of May 2022.

                                      Ralph Bryant Law Firm

                                      <u>s/ Ralph T. Bryant, Jr.</u>
                                      Ralph T. Bryant, Jr.
                                      (N.C. State Bar No. 18119)
                                      *Physical Address*:
                                        313 Clifton St., Suite F
                                        Greenville, N.C. 27858
                                      *Mailing Address*:
                                        P.O. Box 723
                                      Newport, North Carolina 28570
                                      Phone (252) 626-3267
                                      Fax   (252) 294-1624
                                      ralphbryant@ralphbryantlawfirm.com
                                      www.ralphbryantlawfirm.com