**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:22-cv-00247-RJC**

| | |
|---|---|
| **DEANNE M. HALL HAGGINS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **ORDER** |
| ) | |
| **WILSON AIR CENTER, LLC,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

   **THIS MATTER** is before the Court on Defendant Wilson Air, LLC's Motion for Summary Judgment. (Doc. No. 22). This case arises from a work-from-home arrangement that the plaintiff, Deanne M. Hall Haggins, was reluctant to give up. Haggins was diagnosed with breast cancer around the same time that COVID-19 pushed many businesses around the country to remote work, and Haggins' employer, Wilson Air Center, LLC, was one such business. But when Wilson Air brought employees back into the office in Spring 2021, Haggins was unable or unwilling to return. Haggins and Wilson Air eventually agreed that she would work in person several days a week, but when Haggins continued to work from home – then stopped work altogether, Wilson Air terminated her.

   Haggins brought this action in response, alleging disability discrimination, retaliation, and failure to accommodate under the Americans with Disabilities Act, as well as common law Wrongful Discharge in violation of North Carolina public policy. Even evaluating her evidence in the light most favorable to her, Haggins

1

fails to present a *prima facie* case of wrongful discharge, discrimination, retaliation, or failure to accommodate; and even if she had, Wilson Air brings overwhelming evidence of legitimate business reasons for the decisions it made. Therefore, as further explained below, Wilson Air's Motion for Summary Judgment, (Doc. No. 22), is **GRANTED**.

I.     **BACKGROUND**

Wilson Air Center is a fixed base operator in Charlotte offering support and services for private aviation clients. Like many businesses, Wilson Air struggled during the COVID-19 pandemic, and when its operation "hit rock bottom" in July 2020, Wilson Air moved many of its employees to remote work. (Doc. No. 22-1). At about the same time, Deanne Haggins, an Accounting Assistant at Wilson Air, was fighting a more personal battle. On March 13, 2020, Haggins was diagnosed with breast cancer. Despite her diagnosis, Haggins continued to work in person at Wilson Air until early July 2020, when Wilson Air designated her and other employees for remote work in response to low business volume.

As an Accounting Assistant, Haggins held responsibility for Wilson Air's accounts payable process. Most importantly, she managed and organized invoices, which Wilson Air received both electronically and by mail. Such management included receiving paper invoices, printing purchase orders, printing checks, and preparing the invoices, purchase orders, and checks for general manager Vince Papke's review, before filing physical copies of each document. Because Wilson Air relied upon paper records, the above duties could be performed only in the office.

2

When Haggins began working from home, Wilson Air was aware she would be unable to perform all the functions of her Accounting Assistant job. Business was stagnant in Summer 2020, however, so Haggins' boss, Jon Cox, assumed Haggins' in-person duties. This arrangement satisfied both Haggins and Wilson Air until March 2021, when business swung from "record lows to record highs." (*Id.*) By then, the pandemic had subsided, Wilson Air was thriving, and its employees again carried normal workloads. Except for Jon Cox, that is – as long as Haggins worked from home, Cox performed both his own duties and all of Haggins' in-person duties.

Cox, Papke, and HR supervisor Denise Bond met to discuss the situation. Following that meeting, Cox proposed to Haggins on March 29 that she begin working part time in the office again to perform her in-person duties; he suggested "4-5 hours each day . . . to help out with payables and other admin stuff." (Doc. No. 23-7). "I think I can handle that," Haggins responded. (*Id.*). But she continued working from home.

Over a month later, when Wilson Air employees were struggling to meet demand and Haggins had yet to return, Papke, Cox, and Bond scheduled an in-person meeting with Haggins to discuss her status. Haggins secretly recorded the meeting. A transcript reflects an amicable discussion; Papke, Cox, and Bond explained that Haggins could complete certain tasks only by coming into the office, and Haggins agreed she could come in "twice a week." (Doc. No. 28-15 at 11). Haggins also agreed to provide Wilson Air with a schedule, as she was able, so Wilson Air could train another Accounting Assistant.

Again, however, Haggins did not return to work. Instead, on May 17, Haggins called Emily Cates, who provided third-party Human Resources support to Wilson Air alongside Denise Bond. During the call, Haggins explained that, though she agreed to return to the office part-time during the May 11 meeting, she preferred to remain at home, in part because of concerns related to COVID-19. The same day, Wilson Air received a doctor's note asking Wilson Air to "please allow [Haggins] to continue working from home." (Doc. No. 23-9).

Cates then met twice with Papke, Cox, and Bond over the next two weeks to further discuss Haggins' situation and understand the essential functions of Haggins' position. The four came to an agreement: the Accounting Assistant position required at least some in-person work that other employees were unable to handle. Cates explained these findings to Haggins in a phone call on May 25 and informed Haggins that she was required to return to the office for up to thirty hours per week to perform the essential functions of her job. Cates also addressed Haggins' COVID-19 concerns; Haggins could work in a closed office, masked.

Haggins returned the next morning, May 26, and worked between two medical appointments, which left her "mentally and physically exhausted." (Doc. No. 28). She worked remotely on May 27 because of another medical appointment. On June 1, the next day Haggins was scheduled to work, she again reported to work in person, but worked for only "a couple of hours." (*Id.*).

On June 2, Haggins logged into work remotely and messaged Bond to advise Wilson Air she would not appearing in person. Bond informed Haggins that she

would need to report to work or be off that day, so Haggins instructed Bond to mark her as sick. Realizing Haggins would not be returning on June 2, Cox instructed Haggins to turn in her laptop when she returned to work the following day.

But Haggins did not return to work June 3. On the afternoon of June 2, Haggins' doctor scheduled her for immediate surgery. Haggins notified Wilson Air that she would undergo surgery on June 3, and Wilson Air "accommodated [her] absence." (Doc. No. 23-6). On June 4, Papke and Haggins exchanged text messages about Haggins' surgery, and Haggins described an improvement in her condition. On Sunday, June 6, Haggins advised Cox that she would be "taking sick days until cleared to return to work by the physician." (Doc. No. 28-1 at ¶ 41). The following day, June 7, Cox acknowledged receipt of Haggins' text and marked her as sick.

When Haggins neither called nor reported to work on June 8, Denise Bond requested information by email. Haggins did not respond. Wilson Air, accordingly, considered Haggins a no-call, no-show on June 8. The following two days passed the same way; Haggins neither showed up to work nor communicated a plan to do so.

Though Haggins did not herself communicate with Wilson Air, she did attempt to make some arrangements. According to Haggins, she requested on June 8 that her doctor inform Wilson Air that she would be out of work until June 17. Her doctors did send a note – dated June 9 – to Wilson Air which was received on June 10. Wilson Air, considered Haggins to be absent without communication for three consecutive days before it received that note. After receiving the note on June 10, Denise Bond reached out to Haggins again via email. This time, Bond

specifically requested that Haggins "contact me on Wednesday of next week" – the last day covered by the doctor's note – "so that we can plan for your return the following day and determine if there are any reasonable accommodations you might need." (Doc. No. 23-14). Haggins again did not respond.

After Haggins failed to communicate or report to work on Wednesday, June 16 or Thursday, June 17, Wilson Air terminated her. June 17, according to Wilson Air, marked Haggins' fourth no-call, no-show absence in two weeks, following nearly a month of repeated requests for in-person work. Haggins was unaware that her employment ended until June 21. That day, she claims, was the day she intended to return. Eleven months later, she filed this lawsuit.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.* The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the

6

moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249-50.

## III.    DISCUSSION

Haggins brings claims for disability discrimination, failure to accommodate, and retaliation under the Americans with Disabilities Act ("ADA") and common law wrongful discharge in violation of North Carolina public policy. (Doc. No. 1).

7

As a threshold matter, Haggins' common law wrongful discharge claim fails because she also brings an action under the ADA. *See* N.C. Gen. Stat. § 168A-11(c) ("No court shall have jurisdiction over an action filed under this Chapter where the plaintiff has commenced federal judicial or administrative proceedings under ... the Americans with Disabilities Act of 1990 ... involving or arising out of the facts and circumstances involved in the alleged discriminatory practice under this Chapter."); *see also McKinney v. Cleveland Cnty. Bd. of Educ.*, No. 3:20-CV-221-MOC-DSC, 2020 WL 6803846, at *7 (W.D.N.C. Nov. 19, 2020), *aff'd*, No. 22-1697, 2023 WL 4637115 (4th Cir. July 20, 2023) (applying N.C. Gen. Stat. § 168A-11(c) to dismiss claims also brought under the ADA). Thus, only Haggins' claims for disability discrimination, retaliation, and failure to accommodate remain.

## A.    Disability Discrimination

"To establish a claim for disability discrimination under the ADA, a plaintiff must prove (1) that she has a disability, (2) that she is a qualified individual for the employment in question, and (3) that her employer discharged her (or took other adverse employment action) because of her disability." *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015). "Disability discrimination may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework." *Id.*

### 1.    Haggins Fails to Establish Her *Prima Facie* Case

The ADA defines disability as (1) a "physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an

8

impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A). Haggins points to her breast cancer as a disability, and Wilson Air acknowledges Haggins is disabled. *See Jacobs*, 780 F.3d at 572 (quoting 42 U.S.C. § 12102(1)(A)) ("The ADA provides a nonexhaustive list of major life activities, including … 'working.'").

Haggins fails, however, under *Jacobs*' second prong: she is not a "qualified individual for the employment in question." *Jacobs*, 780 F.3d at 572. A qualified individual under the ADA is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." *Reyazuddin v. Montgomery Cnty., Maryland*, 789 F.3d 407, 420 (4th Cir. 2015) (citing 42 U.S.C. § 12111(8)). As an Accounting Assistant, Haggins could perform some essential functions of her job from home, but she could perform other essential functions only in the office. For example, Haggins was responsible for receiving mailed invoices, printing purchase orders, printing checks, collating paper checks, invoices, and purchase orders, preparing envelopes and mail, and filing payment packets (consisting of check stubs, invoices, and purchase orders). (Doc. No. 23-17 at ¶¶ 9-21; Doc. No. 23-2 at ¶ 21).

She could perform none of these tasks at home, and she was unwilling or unable to perform them in person. To be considered a "qualified individual" under the ADA, an employee must not only "possess[] the skills necessary to perform the job in question," but also "be willing and able to demonstrate these skills by coming to work on a regular basis." *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31

9

F.3d 209, 213 (4th Cir. 1994). Indeed, this Court has granted summary judgment to a defendant employer on an ADA claim where the employee was unable to regularly attend work due to breast cancer. *See Shelton v. Charlotte-Mecklenburg Hosp. Auth.*, No. CIV 3:05CV520-H, 2006 WL 3454859, at *6-7 ("[C]ourts have consistently held that the ADA does not require employers to make a 'reasonable accommodation' of allowing an employee to be absent from work, even when the absence results from the allegedly disabling condition.").[1]

Haggins regularly refused or failed to attend work without notifying Wilson Air. Haggins could perform some essential functions of her job remotely, but she refused to avail herself of the reasonable accommodations offered by Wilson Air and complete the other tasks in person. According to both parties' accounts, Haggins

---

[1] *See also Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 197-98 (4th Cir. 1997), *overruled on other grounds by Baird ex rel. Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999) ("Because Halperin was unable to come to work on a regular basis, he was unable to satisfy any of the functions of the job in question, much less the essential ones. As a result, Halperin is not otherwise qualified and, therefore, not protected by the ADA."); *Tyndall*, 31 F.3d at 213 ("Because Tyndall's attendance problems rendered her unable to fulfill the essential functions of her job, and because these problems occurred even with Kee's more than reasonable accommodations for her own disability, we hold that she was not a 'qualified individual with a disability.'"); *Payne v. Fairfax Cnty.*, No. 1:05CV1446 (JCC), 2006 WL 3196545, at *9 (E.D. Va. Nov. 1, 2006) (finding plaintiff was not a qualified individual because his "proposed accommodation effectively relieves Plaintiff from the need to perform the essential function of his coming to work and doing his job, and therefore, it cannot be a reasonable accommodation."); *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994) (finding plaintiff was not a qualified individual because she "could not work a full eight-hour day. With or without reasonable accommodation, then, she could not perform the 'essential function' of coming to work regularly."); *Jackson v. Veterans Admin.*, 22 F.3d 277, 279-80 (11th Cir. 1994) (finding plaintiff was not a qualified individual because "there was no reasonable accommodation for [his] numerous unpredictable absences in the first few months of work as a temporary employee.").

worked in person for only two partial days between May 11 and June 18, after agreeing to work in person two days per week. (Doc. No. 28-15 at 11).

Moreover, Haggins failed to report for work either in person or remotely on June 8, 9, 10, 17, and 18. "Attendance is an essential function of Plaintiff's job," and Haggins was "continuously and unpredictably absent." *See Payne*, 2006 WL 3196545, at *9; *Tyndall*, 31 F.3d at 213 ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA."). Haggins fails, therefore, to establish herself as a "qualified individual."

Even if Haggins demonstrated she was a "qualified individual," she fails again on *Jacobs*' last requirement: she cannot show that Wilson Air discharged her "because of her disability." *Jacobs*, 780 F.3d at 572. Haggins presents no direct or indirect evidence of discrimination, but rather argues under the *McDonnell Douglas* framework that Wilson Air's stated reasons for her termination are a pretext for discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973).

## 2. Haggins Fails Under the *McDonnell Douglas* Framework

"The *McDonnell Douglas* framework is comprised of three steps: (1) the plaintiff must first establish a *prima facie* case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true

11

reason is discriminatory or retaliatory." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).

Assuming, *arguendo*, Haggins had established her *prima facie* case, the burden of production would shift to Wilson Air to demonstrate non-discriminatory, legitimate business reasons for Haggins' termination, which Haggins could then attack as pretextual.

Wilson Air presents satisfactory non-discriminatory reasons for terminating Haggins. After repeated attempts to accommodate Haggins and have her work in person part-time, Haggins neither worked in person nor communicated a plan to work. She then stopped work altogether without notifying Wilson Air, and after she failed to respond or disclose any plans to return, Wilson Air terminated her. Wilson Air meets its *McDonnell Douglas* burden with these reasons. The ADA does not require employers to indulge employees who cannot or will not work, even if an employee's disability keeps them from working. *See Tyndall*, 31 F.3d at 213.

The burden, therefore, shifts back to Haggins to prove by a preponderance of the evidence that these reasons are mere pretext for discrimination. She fails. Haggins argues that discrepancies in Wilson Air's reasons for terminating her prove pretext. Specifically, Haggins points to her termination letter, which states:

> In accordance with our policy on job abandonment, we are terminating your employment effective June 17, 2021. Our handbook states on page 31: Voluntary terminations are initiated by the associate and can include job abandonment (three (3) days no call, no show).

(Doc. No. 28-2). Haggins claims she was not absent without explanation for three consecutive days, and thus, that Wilson Air used the Employment Handbook as a

pretext for "forc[ing] plaintiff to be physically present for work every day." (Doc. No. 28).

Her argument fails for two reasons. First, even if the real reason that Wilson Air fired Haggins was unrelated to Haggins' three consecutive no-call, no-show workdays, Haggins fails to show that any termination decision was discriminatory – a plot to force Haggins to work in person is not necessarily the outgrowth of discrimination, and Haggins does not even begin to explain how an in-person requirement is discriminatory. *See Jacobs*, 780 F.3d at 572.

In any event, Haggins was indeed absent for three consecutive days. Haggins notes that Wilson Air "had in [its] possession a medical note that wrote plaintiff out of work from June 3 2021 through June 17 2021," but her account omits context. (Doc. No. 28). According to Haggins' affidavit, Vince Papke inquired about Haggins' post-surgery status by text on June 4, and on June 6, Haggins texted Jon Cox that she would be "taking sick days until cleared to return to work by the physician." (Doc. No. 28-1). On June 7, Jon Cox "acknowledged receipt" of that text. (*Id.*).

On June 8, however, Haggins did not communicate with Wilson Air; instead, she requested that her doctors send Wilson Air a medical note. But Wilson Air received no note, and the night of June 8, Denise Bond requested information:

I wanted to send a note and check in as we did not hear from you today. I know you were out of the office using a sick day yesterday, but was concerned when you did not make it in to work today or call/email with an update as to your status. Please let me know what is happening with your situation.

(Doc. No. 23-12). Haggins did not respond to Denise Bond's email. Her doctors did send a note to Wilson Air, but the note is dated June 9 and Wilson Air received it on June 10. (Doc. No. 23-1). When Wilson Air received the note, Bond again emailed:

> I sent you an e-mail on Tuesday the 8th because you did not show up for work, and we did not hear from you. We knew you were going to be out of work on Monday the 7th, but we did not have any notice that you would be out for multiple days. We just received a note from your doctor saying you needed to be out until next Thursday. When you expect to miss work for multiple days, we need you to let us know in advance. As you know, you exhausted all of your FMLA on January 18, 2021, but we will grant you this additional leave as a reasonable accommodation under the ADA.
>
> Please contact me on Wednesday of next week so that we can plan for your return the following day and determine if there are any reasonable accommodations that you might need, which would enable you to perform your essential job duties. I hope you have a speedy recovery and look forward to hearing from you next week.

(Doc. No. 23-14). Again, Haggins answered with silence.

These three days – June 8, 9, and 10 – are the three consecutive days on which Wilson Air based Haggins' termination (with a fourth non-consecutive day on June 17). Though the doctor's note excuses Haggins for medical reasons, Wilson Air did not receive the note until Haggins was already absent for three consecutive days, regardless of when Haggins requested the note be sent. Moreover, Haggins refused to communicate directly with Wilson Air about her plans and failed to return to work on the day that the note indicated she would return (June 17). Wilson Air communicated to Haggins at the time that it considered her absent on June 8, 9, and 10, and Denise Bond reiterated that sentiment in her deposition.

These events do not suggest that Wilson Air terminated Haggins as a pretext for discrimination. To the contrary, the timeline and exhibits demonstrate that Wilson Air attempted time and again to accommodate Haggins and requested only that Haggins keep Wilson Air apprised of her plans to be absent. When Haggins neither appeared for work nor communicated plans to return, Wilson Air

14

terminated her. *Cf. Smith v. Charter Commc'ns, Inc.*, No. 3:18-CV-80-MOC-DSC, 2020 WL 3606391, at *8 (W.D.N.C. July 2, 2020) (granting summary judgment on an ADA claim where the plaintiff abandoned his job).

Thus, Haggins fails to establish a *prima facie* case of disability discrimination and, even if she had, she fails under the *McDonnell Douglas* framework to show that Wilson Air's reasons for its actions were merely a pretext for discrimination.

### B. Retaliation

A plaintiff may prove a retaliation claim in violation of Title VII either through direct and indirect evidence of retaliatory animus or through the *McDonnell Douglas* burden-shifting framework. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Here, Haggins offers neither direct nor indirect evidence of retaliatory animus, so she must proceed under the *McDonnell Douglas* framework and first establish her *prima facie* case.

To establish a *prima facie* claim of retaliation without direct evidence, Haggins must show: "(1) that [she] engaged in protected activity, (2) that the employer took a materially adverse action against [her] and (3) there is a causal connection between the protected activity and the adverse action." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 411 (4th Cir. 2022) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61-68 (2006)).

If a plaintiff establishes her *prima facie* claim of retaliation, the defendant can offer a legitimate, non-discriminatory reason for the action in question, and the plaintiff then must prove by a preponderance of the evidence that the proffered

reason was a pretext for discrimination. *Campbell v. Nielsen*, No. 3:17-CV-707-RJC-DCK, 2019 WL 1230349, at *5 (W.D.N.C. Mar. 15, 2019), *aff'd sub nom. Campbell v. McAleenan*, 776 F. App'x 132 (4th Cir. 2019).

Haggins argues that Wilson Air retaliated against her by terminating her and "revok[ing]" the reasonable accommodation the parties agreed to on May 11. Wilson Air concedes that Haggins engaged in protected activity by contacting Emily Cates on May 12 and that termination was a materially adverse action. If Wilson Air also revoked any accomodations it offered Haggins, such action would likewise be "materially adverse." *See Burlington*, 548 U.S. at 68 ("[M]aterially adverse … in this context means [the action] well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."). Thus, Haggins' retaliation claim turns upon the causal connection between her complaint and Wilson Air's actions and upon Wilson Air's legitimate business reasons for those actions.

### 1. Haggins Fails to Establish Her *Prima Facie* Case

"[T]o establish the necessary causation for a retaliation claim, the employer must have taken the adverse employment action because the plaintiff engaged in a protected activity." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 214 (4th Cir. 2019). Though a plaintiff need not show that her protected activities were the but-for cause of the adverse action, she "still must make some showing of causation." *Id.* Haggins can demonstrate causation through two routes: either by establishing facts that suggest the adverse action occurred because of the protected activity or by establishing that the adverse act "bears sufficient temporal proximity to the

protected activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021). "The existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action." *Id.*

A plaintiff must present more, however, than "[n]aked allegations of a causal connection between plaintiff's protected activity and the alleged retaliation," and timing alone may not be enough to establish a causal connection. *Southern v. AMain.com, Inc.*, No. 322CV00096RJCDSC, 2022 WL 1416427, at *3 (W.D.N.C. May 4, 2022). Above all, "the significance of any given act ... will often depend upon the particular circumstances. Context matters." *Burlington*, 548 U.S. at 69.

Haggins offers three assertions to demonstrate causation: "the false reasons stated in the termination letter, the admission by Emily Cates that the reason stated in the termination letter were false, and the temporal proximity of 23 days." (Doc. No. 28 at 21). As discussed above, the reasons stated in the termination letter were not false – Haggins was absent for three consecutive days.

Moreover, Emily Cates made no admission of untruth. Haggins points to Cates' deposition statement, where Cates noted that Haggins "was terminated due to the fact that on May 25th I told her, you have to be in the office in order to do the job. And she only returned to work one day between May 25th and June 17th." (Doc. No. 28-18 at 27). Haggins wrenches this statement out of context to create a falsehood, but Cates' description captures the larger context of Haggins' inability or unwillingness to perform her job at Wilson Air. That context includes not only the

three missed days in June that triggered a discrete section of the Employee Handbook, but also Haggins' broader refusal to perform the essential functions of her job at all.

Without any other relevant facts supporting a causal link, the temporal proximity of Haggins' complaint and termination alone is insufficient to prove a *prima facie* case of retaliation. *See Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014). "Context matters," *Burlington*, 548 U.S. at 69, and the context of Haggins' termination is unambiguous. Wilson Air offered Haggins a reasonable accommodation, and Haggins was unwilling or unable to take advantage of it. Instead of communicating with her employer about the issue, Haggins expected Wilson Air to wait for her return. Termination under these circumstances evidences no discrimination – Haggins "must, in the end, offer some evidence to support the essential elements of [her] claim," *Perkins*, 936 F.3d at 215, and she fails to do so.

Haggins also argues that Wilson Air retaliated against her by agreeing to a reasonable accommodation during the May 11 meeting, then "revoking" it after Haggins complained to Emily Cates. (Doc. No. 28). These events, too, lack a sufficient causal relationship to establish discrimination.

The parties agree that Wilson Air offered Haggins a reasonable accommodation during the May 11 meeting, and Haggins evidently agreed to the arrangement – according to her, "[t]he reasonable accommodation was that the plaintiff could perform some duties remotely, the plaintiff would perform some duties in person, and the employer would work around plaintiff's scheduled medical

18

visits." (Doc. No. 28). The parties also agreed Haggins would communicate with Wilson Air about when she was able to work in person. (Doc. No. 28-15 at 12-13).

But Haggins did not perform her duties in person, and she did not communicate with Wilson Air about her work schedule. She worked two partial days after the May 11 meeting, and when Wilson Air advised Haggins that she would be required to return to the office, Haggins continued to work remotely. At that point, because Haggins refused to meaningfully implement the proposed accommodations, Wilson Air asked that Haggins return her laptop.

Haggins identifies nothing in this sequence of events that suggests Wilson Air requested Haggins return her laptop because she complained to Emily Cates. Instead, Haggins relies upon the same three arguments discussed above: "the false reasons stated in the termination letter, the admission by Emily Cates that the reason stated in the termination letter were false, and the temporal proximity of 23 days." (Doc. No. 28 at 21). For the same reasons discussed above, Haggins fails to demonstrate a causal relationship with those three claims, and thus, she fails to establish a *prima facie* claim of retaliation.

### 2. Haggins Fails under the *McDonnell Douglas* Framework

Even if Haggins established her *prima facie* case, Wilson Air rebuts it with evidence of legitimate, non-discriminatory reasons for her termination. Wilson Air's reasons for terminating Haggins are discussed at length herein (Haggins neither worked in person nor communicated a plan to do so), and Haggins fails to show that these legitimate reasons were a pretext for discrimination. Haggins bases her

19

pretext arguments on the same foundations as her causal connection arguments: that the termination letter was false, that the events were temporally linked, that Emily Cates admitted the termination "arose out of her conversation regarding reasonable accommodation," and that a medical note covers the dates at issue.

The first three reasons are discussed above, and none bolsters Haggins' pretext argument. Circumstances around the medical note suggest no pretext either. Though Wilson Air received a doctor's note that referenced Haggins' three consecutive absent days (June 8, 9, and 10), Wilson Air did not receive that note until June 10, when Haggins had already failed to appear or to communicate for those three days.

In any event, a doctor's note will not prevent an employer from terminating an otherwise unqualified employee, and the fact that Wilson Air excused Haggins whenever it did receive doctors' notes deflates Haggins' discrimination arguments. *See Shelton*, 2006 WL 3454859, at *2, 6-7 (granting employer's motion for summary judgment though employee was terminated during a period covered by a doctor's note). Thus, Haggins fails to establish a *prima facie* case of retaliation and, even if she had, she fails under the *McDonnell Douglas* framework to show that Wilson Air's reasons for its action were merely a pretext for discrimination.

## C. Failure to Accommodate

"To show an employer's failure to accommodate, the plaintiff must prove: (1) that she had a disability within the statutory meaning; (2) that the employer knew of her disability; (3) that a reasonable accommodation would permit her to

20

perform the essential functions of the position; and (4) that the employer refused to make the accommodation." *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 (4th Cir. 2021).

The parties agree that Haggins was disabled and that Wilson Air knew of her disability. Haggins' failure to accommodate claim, therefore, "turns on whether Plaintiff satisfies the third element: that [she] was a qualified individual under the ADA, such that had [she] been given a reasonable accommodation, [she] could have 'perform[ed] the essential functions of the job.'" *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (quoting 42 U.S.C. § 12111(8)).

The crux of Haggins' failure to accommodate claim rests on the idea that by requiring Haggins to return her laptop on June 2 (thereby "revoking" the agreed-upon reasonable accommodation), Wilson Air refused to provide Haggins an accommodation of working from home at all.

The parties evidently agree that a reasonable accommodation would permit Haggins to perform the essential functions of her job, and the parties settled on that reasonable accommodation on May 11 – Haggins would perform some necessary duties in the office "twice a week" but could otherwise work from home. (Doc. No. 28-15 at 11). The conflict stems not from whether Wilson Air offered an accommodation, but from whether Haggins took advantage of it.

"If an employee rejects a reasonable accommodation, the individual is no longer considered a 'qualified individual with a disability.'" *Elledge v. Lowe's Home Centers, LLC*, No. 516CV00227RJCDCK, 2018 WL 6705537, at *11 (W.D.N.C. Dec.

20, 2018) (Conrad, J.), *aff'd*, 979 F.3d 1004 (4th Cir. 2020) (quoting *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008)).[2] Haggins rejected the reasonable accommodation offered to her here. On May 11, Wilson Air proposed an accommodation that would allow Haggins to perform the essential responsibilities of her job: come into the office part-time. (Doc. No. 28-15 at 11). Though Haggins initially agreed, she later found the agreement unsatisfactory and complained to Emily Cates. She did not come into the office.

Two weeks after the original accommodation discussion – during which time Haggins had not availed herself of the reasonable accommodations – Wilson Air informed Haggins that she must return to the office and that she would be scheduled for 30 hours per week. (Doc. No. 23-20 at ¶ 17). After that call, on May 26 and June 1, Haggins reported to work for limited hours and otherwise worked remotely (she left early both days). On June 2, Haggins informed Wilson Air that she would not be coming into the office, and at that point, Wilson Air required Haggins to return her laptop.

Twenty-seven workdays passed from the time that Haggins agreed to work intermittently in the office until the time she was terminated, and during that time,

---

[2] *See also Elledge v. Lowe's Home Centers, LLC*, 979 F.3d 1004, 1013 (4th Cir. 2020) ("At any time during the accommodations period, [plaintiff] could have availed himself of an in-store scooter and at least tried it out. He did not, and he had no intention of ever doing so. In practice, then, Elledge rejected this accommodation. Lowe's, possessing 'ultimate discretion' over the choice among reasonable accommodations, was not—in the face of Elledge's rejections of such an obvious and helpful offer—required to extend another."); *Andrews v. Com. of Virginia*, 232 F.3d 886 (4th Cir. 2000) (table) ("[T]he accommodations offered … were objectively reasonable and, therefore, Andrews' rejection of the proposed accommodations removes her from the category of 'qualified individuals with a disability.'").

22

Haggins appeared in the office for only two partial days. On May 17, following four no-call, no-show days and several weeks of non-FMLA-covered leave, Wilson Air terminated Haggins. She testified that she had planned to return to work on June 21, but she did not advise Wilson Air of her plans. Wilson Air created a path for Haggins to fulfill the essential functions of her job, "but this path … was foreclosed by [Haggins] herself." *Elledge*, 979 F.3d at 1013.

The ADA imposes no burden on Wilson Air to repeatedly ask Haggins to take advantage of the reasonable accommodations offered, *see Elledge*, 2018 WL 6705537, at *11, yet Wilson Air requested at least three times. In the end, however, Haggins failed to make use of the accommodations, and Wilson Air "was not—in the face of [Haggins'] rejections of such an obvious and helpful offer—required to extend another." *Elledge*, 979 F.3d at 1013.

Therefore, because Haggins' rejection of Wilson Air's accommodations rendered her unqualified, she cannot show that Wilson Air failed to accommodate her disability.

## IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant Wilson Air Center, LLC's Motion for Summary Judgment, (Doc. No. 22), is **GRANTED**. The Clerk is directed to close this case.

Signed: December 1, 2023

Robert J. Conrad, Jr.
United States District Judge